**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TEVA PHARMACEUTICALS USA, INC., *et al.*,

      Plaintiffs,

   v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al*.,

      Defendants,

SANDOZ INC.,

      Intervenor-Defendant,

MYLAN PHARMACEUTICALS INC.,

      Intervenor-Defendant.

Civil Action No. 1:20-cv-00808-BAH

**SANDOZ INC.'S CONSOLIDATED MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
<u>IN SUPPORT OF SANDOZ INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION. ..................................................................................................1

II. STATUTORY BACKGROUND. .........................................................................2

    A.  Before The BPCIA, Some Proteins Were Regulated Under The FDCA..................2

    B.  Before The BPCIA, There Was No Abbreviated Pathway for Biological
        Products..................................................................................................................3

        1.  Congress Wanted to Create an Abbreviated Pathway for Biological
            Products.................................................................................................4

        2.  Congress Specifically Recognized the Importance of Maintaining
            Scientific Deference to FDA..................................................................4

    C.  The BPCIA Created an Abbreviated Pathway for Biological Products. ..................5

        1.  The BPCIA Expanded the Definition of "Biological Product" to
            Include Proteins, and Established a Transition Period for Affected
            Products.................................................................................................5

        2.  Congress Did Not Define the Terms in the Expanded Definition of
            "Biological Product."............................................................................6

            a.  FDA Created a Protein Definition Working Group,
                Obtained Input from a Broad Group of Expert Scientific
                Stakeholders, and Reviewed Numerous Scientific Texts. ................6

            b.  FDA Issued a Detailed Memorandum Concerning Its
                Interpretation of "Protein (Except any Chemically
                Synthesized Polypeptide)."..............................................................6

                i.  A Specific, Defined Sequence Is at the Heart of
                     "Protein." ..........................................................................7

                ii.  No Scientific Consensus Exists as to the Definition
                     of "Protein."......................................................................8

                iii.  FDA's Interpretation Took Into Account
                     Chemically Synthesized Proteins.........................................9

             c.  FDA Considered Congress's Objectives In Interpreting the
                BPCIA.............................................................................................10

        3.  FDA Subjected Its Interpretation of "Protein" and "Chemically
            Synthesized Polypeptide" To Notice and Comment Rulemaking. ...............10

     a.  FDA Published Multiple Industry Guidances. ................................10

     b.  FDA Engaged in Notice and Comment Rulemaking To Define "Protein." ...............................................................................11

    4.  Congress Further Amended the PHSA and FDA Finalized Its Rulemaking. ........................................................................................12

III.  FACTUAL BACKGROUND. .......................................................................13

  A.  Teva Filed Eight Citizen Petitions To Delay Generic Competition. ........................14

  B.  FDA Denied All Eight of Teva's Petitions. .................................................15

  C.  Teva Filed Multiple Lawsuits To Further Delay Generic Market Entry. .................16

  D.  FDA Approved Sandoz's and Mylan's ANDAs with A-Ratings. ............................16

  E.  FDA Implemented the Transition Rule Without Copaxone. ....................................17

IV.  APPLICABLE LEGAL STANDARDS. ........................................................18

  A.  Standing. ..........................................................................................18

  B.  Summary Judgment. ...........................................................................19

  C.  Review of Agency Decisions under 5 U.S.C. § 706(2)(A). ......................................20

V.  THERE IS NO JURISDICTION BECAUSE TEVA LACKS STANDING. .......................21

  A.  Each of Teva's Purported Harms Is Wholly Speculative. ........................................22

  B.  There Is No "Informational Injury." .......................................................22

  C.  Teva's "Statutory Rights" Argument Fails. ............................................................23

  D.  There Is No Competitive Harm. ..........................................................24

VI.  ARGUMENT. .............................................................................................26

  A.  FDA's Interpretation of "Protein" is Entitled to Deference, and Is Permissible Under Both *Chevron* I and II. ...........................................................26

    1.  FDA's Interpretation Is Entitled to *Chevron* Deference. .............................26

    2.  Teva's *Chevron* I Argument is Baseless. ....................................................27

    3.  FDA's Interpretation Must Be Upheld under *Chevron* II. .............................29

a. The 2011 Protein Memo Sets Forth FDA's Extensive Consideration of, and Ultimate Construction of, "Protein." ..............30

b. FDA's "Protein" Definition Was Subject to Notice and Comment Rulemaking. ....................................................32

c. FDA's Refusal to Transfer Copaxone Is Proper Because GA Is Not a Protein............................................33

d. Teva's Arguments All Fail...................................................34

    i. FDA's Statutory Interpretation Recognizes, and Expressly Incorporates, Chemically Synthesized Proteins. ...........................................34

    ii. A Chemically-Synthesized Protein Must Necessarily Have a Specific, Defined Sequence. .................35

B. FDA's Application of Its Protein Definition Has Not Been Arbitrary Or Capricious. ...............................................................36

1. FDA Does Not Distinguish Between Natural and Synthetic Proteins: Each Is Held To the Requirement for a Specific, Defined Sequence. ....................................................36

2. FDA's Treatment of Vitrase, Creon, and Copaxone Is Not Inconsistent. ...................................................37

3. FDA's Approval of GA ANDA Products Is Not Inconsistent.....................39

a. A Specific, Defined Sequence Requires that the Entire Sequence Be Replicated for Each Protein Molecule. .......................39

b. FDA's Approval of GA ANDA Products Does Not Mean GA's Sequences Are Specific and Defined. .....................................39

C. Copaxone Is Not Analogous To a Protein Because It Lacks a Protein's Unique Feature...........................................................42

1. FDA's Interpretation of "Analogous" Is Not Foreclosed Under *Chevron* I. ...................................................42

a. FDA Already Determined that GA Lacks the "Critical Features" of a Protein...........................................42

b. FDA Already Rejected Criteria Based on Function and Structure...........................................................42

2.   FDA's Interpretation of "Analogous" Is Reasonable under *Chevron* II. ..................................................................................43

     a.   Teva's Argument Strips "Analogous" of any Meaning or Boundaries. ..................................................................43

     b.   FDA Has Applied Its Interpretation of "Analogous" Consistently...........................................................44

VII.   CONCLUSION.......................................................................45

# TABLE OF AUTHORITIES

## Federal Cases

*Actavis Elizabeth LLC v. FDA*,
  625 F.3d 760 (D.C. Cir. 2010) ............................................................................. 21

*Alabama Power Co. v. Ickes*,
  302 U.S. 464 (1938) ............................................................................................. 25

*Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*,
  724 F.3d 243 (D.C. Cir. 2013) ............................................................................. 30

*Animal Legal Defense Fund, Inc. v. Espy*,
  29 F.3d 720 (D.C. Cir. 1994) ........................................................................ 19, 24

* *ANR Pipeline Co. v. FERC*,
  205 F.3d 403 (D.C. Cir. 2000) ...................................................................... 23, 25

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*,
  539 F. Supp. 2d 4 (D.D.C. 2008) ......................................................................... 24

*Ass'n of Battery Recyclers, Inc. v. EPA*,
  716 F.3d 667 (D.C. Cir. 2013) ............................................................................. 25

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
  397 U.S. 150 (1970) ............................................................................................. 19

*AstraZeneca Pharm. LP v. FDA*,
  872 F. Supp. 2d 60 (D.D.C. 2012) ....................................................................... 29

* *Barnhart v. Walton*,
  535 U.S. 212 (2002) ............................................................................................. 21

* *Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................. 19

*Calumet Indus., Inc. v. Brock*,
  807 F.2d 225 (D.C. Cir. 1986) ............................................................................. 25

* *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ...................................................................................... 20, 21

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................................. 20

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ............................................................................................. 19

*Ctr. for Bio. Diversity v. Bernhardt*,
　No. 18-cv-02576-RC, 2020 WL 709635 (D.D.C. Feb. 12, 2020) ............................................ 23

*Guedes v. BATFE*,
　920 F.3d 1 (D.C. Cir. 2019) ...................................................................................................... 26

*Hagelin v. FEC*,
　411 F.3d 237 (D.C. Cir. 2005) .................................................................................................. 20

*Havens Realty Corp. v. Coleman*,
　455 U.S. 363 (1982) ................................................................................................................... 23

*Hazardous Waste Treatment Council v. EPA*,
　861 F.2d 277 (1988) ................................................................................................................... 25

*Hill Dermaceuticals, Inc. v. FDA*,
　No. 11-cv-01950-RCL, 2012 WL 5914516 (D.D.C. May 18, 2012) ........................................ 19

*Kaiser Found. Hosps. v. Sebelius*,
　828 F. Supp. 2d 193 (D.D.C. 2011) ........................................................................................... 20

* *Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) ............................................................................................................ 19, 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ..................................................................................................................... 20

* *Mylan Labs., Inc. v. Thompson*,
　389 F.3d 1272 (D.C. Cir. 2004) ................................................................................................. 21

*Nat'l Ass'n for Home Care & Hospice v. Burwell*,
　142 F. Supp. 3d 119 (D.D.C. 2015) ........................................................................................... 29

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
　417 F.3d 1272 (D.C. Cir. 2005) ................................................................................................. 23

*Purepac Pharm. Co. v. Thompson*,
　354 F.3d 877 (D.C. Cir. 2004) ................................................................................................... 21

*Ranbaxy Labs. Ltd. v. Burwell*,
　82 F. Supp. 3d 159 (D.D.C. 2015) ....................................................................................... 32, 43

*Roberts v. United States*,
　883 F. Supp. 2d 56 (D.D.C. 2012) ............................................................................................. 19

*Sandoz Inc. v. Amgen Inc.*,
　137 S. Ct. 1664 (2017) .......................................................................................................... 5, 23

*Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*,
  512 F. Supp. 2d 32 (D.D.C. 2007) ....................................................................... 30, 43

* *Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998) ........................................................................... 20, 21

* *U.S. v. Mead Corp.*,
  533 U.S. 218 (2001) ............................................................................................. 21, 26

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ............................................................................. 27, 29

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................................... 19

## Federal Statutes

21 U.S.C. § 355(b)(1) ....................................................................................................... 2

21 U.S.C. § 355(j)(2)(A) .................................................................................................. 2

21 U.S.C. § 355(j)(7) ....................................................................................................... 2

42 U.S.C. § 262(a)(2)(A) ................................................................................................ 26

42 U.S.C. § 262(i) (2009) ................................................................................................. 3

* 42 U.S.C. § 262(i)(1) ..................................................................................................... 6

42 U.S.C. § 262(i)(2) ....................................................................................................... 5

42 U.S.C. § 262(i)(3) ....................................................................................................... 5

42 U.S.C. § 262(k)(4) ...................................................................................................... 5

5 U.S.C. § 706(2)(A) ...................................................................................................... 20

Biologics Price Competition and Innovation Act of 2009, Pub. L. No. 111-148,
  § 7002(b)(2) (2010) ..................................................................................................... 6

Biologics Price Competition and Innovation Act of 2009, Pub. L. No. 111-148,
  § 7002(e)(1) (2010) ..................................................................................................... 6

* Biologics Price Competition and Innovation Act of 2009, Pub. L. No. 111-148,
  § 7002(e)(4) (2010) ..................................................................................................... 6

## Federal Regulations

* 21 C.F.R. § 600.3(h)(6) ......................................................................................... 27, 42

## Other Authorities

*Examining FDA Follow-On Biologics*, Hrg. before the Senate Comm. on Health, Education, Labor, and Pensions, 110th Cong. at 48 (S. Hrg. 110-375, Mar. 8, 2007)............................. 4, 5

FOOD & DRUG ADMIN., *Approved Drug Products with Therapeutic Equivalence Evaluations* (40th ed. 2020).................................................................................................................... 3

FOOD & DRUG ADMIN., GUIDANCE FOR INDUSTRY: *Determining Whether to Submit an ANDA or 505(b)(2) Application* (May 2019) ............................................................................................ 3

*Safe and Affordable Biotech Drugs: The Need for a Generic Pathway*, Hrg. before the House Comm. on Oversight and Gov't Reform, 110th Cong. (H. Hrg. 110-43, Mar. 26, 2007) ....................................................................................... 24, 25

**[All emphasis added unless otherwise noted.]**

—

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 2020 Act | Further Consolidated Appropriations Act, 2020 |
| ANDA | Abbreviated New Drug Application |
| BLA | Biologics License Application |
| BPCIA | Biologics Price Competition and Innovation Act |
| FDA | United States Food and Drug Administration |
| FDCA | Federal Food Drug & Cosmetic Act |
| GA | Glatiramer Acetate |
| NDA | New Drug Application |
| Orange Book | FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* Publication |
| PHSA | Public Health Service Act |
| RLD | Reference Listed Drug |
| RPS | Reference Product Sponsor |

## I.   INTRODUCTION.

Technically, this case concerns Teva's challenge to FDA's interpretation of the statutory term "protein," and the Agency's refusal to transition Teva's branded Copaxone (glatiramer acetate) product to a BLA. Actually, it is just Teva's latest blatant attempt to hinder generic competition for Copaxone. Indeed, Teva has spent *12 years* petitioning FDA to prevent the approval of generic versions of Copaxone, and pursuing multiple lawsuits to tie up Sandoz, Mylan and other competitors in the courts. But FDA denied all *eight* of Teva's petitions, and the courts invalidated the last of Teva's Orange Book patents in October 2018. With its back against the wall, Teva came up with a new theory: Copaxone should be transitioned to a licensed BLA, and competitors' follow-on products should no longer be substituted for Copaxone at pharmacies—despite the fact that the public has enjoyed the automatic substitution of more affordable A-rated ANDA products since June 2015, saving patients over two billion dollars to date. But even putting aside the obvious anti-consumer nature of this case, it is apparent that it has no merit.

*First*, Teva has not established (and cannot establish) standing. Indeed, Teva failed to show any non-speculative injury, and each of its standing arguments is both factually and legally flawed. This is also the case for Teva's allegations of "competitive" harm, because while increasing competition is within the zone of interests protected by the statute at issue here, *suppressing* competition is not.

*Second* (if the court does find standing to reach the merits), Teva's challenge fails because FDA's decision to not transition Copaxone on grounds that it is neither a "protein" nor an "analogous product" is based on a statutory interpretation that: (i) is highly scientific, thoughtful, and well-reasoned; (ii) was vetted (for nearly a decade both within FDA, and publicly through notice and comment rulemaking); (iii) is permissible under the statute and preferable

from a policy perspective; (iv) has remained consistent over the years—as has FDA's application of that interpretation to other biological products; and (v) is entitled to a high level of deference.

In view of these facts and those set forth below—and in light of the deference due the Agency's decision—Sandoz respectfully requests that, should the Court be inclined to rule on the merits, the Court deny Teva's motion for summary judgment and grant Sandoz's cross-motion.

## II.   STATUTORY BACKGROUND.

FDA regulates, *inter alia,* the safety and efficacy of "drug" products under the FDCA, and the safety, purity, and potency of "biological products" under the PHSA. In 1984, in part because the application and approval process for new drugs was prohibitively costly and time-consuming, Congress passed the Hatch-Waxman Amendments ("Hatch Waxman"), which created two abbreviated approval mechanisms under the FDCA: the ANDA and the 505(b)(2) pathways, both of which allow an applicant to rely on FDA's findings of safety and efficacy for a previously approved product designated as the RLD. In 2010, Congress enacted the BPCIA to create an abbreviated approval pathway under the PHSA, which is at the heart of the current suit.

### A.   Before The BPCIA, Some Proteins Were Regulated Under The FDCA.

Under the FDCA, a company seeking to sell a new (previously unapproved) drug must file an NDA containing technical data on the composition of the drug, the means for manufacturing it, clinical trial results to establish the safety and efficacy of the drug, and labeling for the use of the drug for which approval is requested. *See* 21 U.S.C. § 355(b)(1). FDA publishes a list of these drugs and certain associated patent information covering the drug product in a publication commonly referred to as the "Orange Book." 21 U.S.C. § 355(j)(7).

Under the ANDA pathway, a generic manufacturer can rely on FDA's previous findings of safety and efficacy for an RLD if it shows, *inter alia*, that its proposed product is both bioequivalent to, and the "same as," the RLD. 21 U.S.C. § 355(j)(2)(A). When an ANDA

2

product meets these strict sameness criteria, FDA typically gives it a so-called "A" therapeutic equivalence rating, signaling that it will produce the same clinical effect and has the same safety profile as the RLD and thus can be automatically substituted at the pharmacy level. *See* Orange Book Preface at vii, xiii (40th ed., 2020)[1]. In contrast, the 505(b)(2) pathway permits certain differences in active ingredient, dosage form, route of administration, strength, indication, or other conditions of use, if such differences are supported by sufficient safety and efficacy data. FDA GUIDANCE, *Determining Whether to Submit an ANDA or 505(b)(2) Application* at 3-5 (May 2019). As 505(b)(2) drug products typically cannot meet the "same as" requirements, they are usually *not* interchangeable with the RLD. *Id.* at 3.

Prior to 2010, FDA regulated a small number of protein and peptide products under the FDCA. FDA786. Historically, use of the ANDA pathway has not been appropriate for the approval of interchangeable versions of proteins because of the challenges involved in showing that two protein products have the same active ingredient. *See, e.g.*, FDA293, FDA299. The ANDA pathway is, and has been, available, however, for peptides where scientific techniques are available to show sameness. FDA293.

**B. BEFORE THE BPCIA, THERE WAS NO ABBREVIATED PATHWAY FOR BIOLOGICAL PRODUCTS.**

"Biological products" have been regulated under the PHSA since at least 1944 and, until 2010, were defined as: "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product...applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i) (2009). Most "biological products" are not made by chemical processes—rather, they are made with biotechnology or derived from natural sources. *See, e.g.*, FDA119 (there are "scientific and

---

[1] https://www.fda.gov/media/71474/download.

technical complexities that may be associated with the larger and often more complex structure of biological products, as well as the processes by which such products are manufactured. Most biological products are produced in a living system such as a microorganism, or plant or animal cells…."). Differences in manufacturing processes can produce "highly similar," but not structurally identical, products, which can result in clinically meaningful differences.

### 1. Congress Wanted to Create an Abbreviated Pathway for Biological Products.

Prior to 2010 there was no abbreviated approval pathway for biological products under the PHSA—rather, the FDCA, as amended by Hatch Waxman, provided the only abbreviated approval pathways, and even these were available for only a small number of protein and peptide products. Motivated by Hatch Waxman's success in increasing competition for generic drugs, Congress sought to create a similar abbreviated pathway for biological products shown to be "highly similar" to, or in some cases "interchangeable" with, an FDA-licensed biological product. *See, e.g.*, FDA119. This gave rise to the BPCIA.

### 2. Congress Specifically Recognized the Importance of Maintaining Scientific Deference to FDA.

Congress recognized that, in creating the new regulatory scheme that was to become the BPCIA, it was important to maintain scientific deference to FDA. *See, e.g.*, *Examining FDA Follow-On Biologics*, Hrg. before the Senate Comm. on Health, Education, Labor, and Pensions, 110th Cong. at 48 (S. Hrg. 110-375, Mar. 8, 2007) (Sen. Coburn) (Congress must preserve "tremendous flexibility to build in what the science is going to show in the future"); *id.* at 2 (Sen. Kennedy) ("we must be led by the science...*legislation on follow-on biologics* must not pre-judge science but *should enable the FDA to make the best decisions based on the most complete science reasonably available*."); *id.* at 9 (Sen. Schumer) ("*we should pass legislation that would give the FDA the discretion to establish a scientific approval process as they see fit*."); *id.* at 42

(Sen. Clinton) (central issue is how Congress "*empower[s] the FDA* to do the job we expect it to do in order to remain the Gold Standard globally, when it comes to drug and biologic approvals); *id.* at 55 (Sen. Clinton) ("*we need to give the FDA authority and we need to empower them with adequate resources to begin to design this pathway*"; and Congress "*should leave [the approval process] to the scientists and to the structure that we try to establish*.").

### C.  THE BPCIA CREATED AN ABBREVIATED PATHWAY FOR BIOLOGICAL PRODUCTS.

On March 23, 2010, Congress enacted the BPCIA, thereby creating an abbreviated pathway for "biological products" shown to be biosimilar to, or interchangeable with, an FDA-licensed "biological product" (*i.e.*, the reference product).[2] In addition, the BPCIA created "a carefully calibrated scheme for preparing to adjudicate, and then adjudicating, claims of infringement." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1670 (2017) (citing 42 U.S.C. § 262(*l*)). Under this scheme, commonly referred to as the "patent dance," a biosimilar applicant has the ***option***, but ***not*** the obligation, of participating in a series of pre-suit exchanges with the RPS upon acceptance of its application. *Id.* at 1675. In other words, if the biosimilar applicant opts out of the patent dance, the RPS will receive no notice of the application until the applicant elects to disclose the filing or is FDA approved, and no confidential information about the biosimilar application until it is disclosed through discovery in litigation.

### 1.  The BPCIA Expanded the Definition of "Biological Product" to Include Proteins, and Established a Transition Period for Affected Products.

In enacting the BPCIA, Congress expanded the definition of "biological product" to include any "protein (except any chemically synthesized polypeptide)," causing such products

---

[2] By statute, a "biosimilar" is "highly similar to the reference product, notwithstanding minor differences in clinically inactive components, and there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product." 42 U.S.C. § 262(i)(2). Biosimilars can be designated as interchangeable if FDA determines, *inter alia*, it "can be expected to produce the same clinical result as the reference product in any given patient." 42 U.S.C. § 262(i)(3), (k)(4).

previously regulated under the FDCA to be regulated under the PHSA. Pub. L. No. 111-148, § 7002(b)(2) (2010) (codified at 42 U.S.C. § 262(i)(1)); BPCIA § 7002(e)(1). Congress also established a transition period providing that, as of ten years after enactment (*i.e.*, on March 23, 2020), "biological products" previously approved under the FDCA would be deemed "biological products" licensed under the PHSA ("Transition Products"). BPCIA § 7002(e)(4) ("Transition Provision").

### 2. Congress Did Not Define the Terms in the Expanded Definition of "Biological Product."

Congress did not define any of the terms "protein," "chemically synthesized," "polypeptide," or the related term "peptide," in the BPCIA, and instead delegated that function to FDA. FDA294. As such, FDA—the agency charged with implementing this complex statute—was required to undertake that scientific analysis itself.

### a. *FDA Created a Protein Definition Working Group, Obtained Input from a Broad Group of Expert Scientific Stakeholders, and Reviewed Numerous Scientific Texts.*

To tackle this sizable task, FDA created a cross-center, multi-disciplinary "Protein Definition Working Group" to analyze the potential approaches the Agency could take. FDA293-94. In addition, FDA held a public hearing in November 2010 to obtain input from a broad group of stakeholders (current and prospective BLA and NDA holders, biologic manufacturers, industry and patient associations, and the public) to identify the scientific and technical considerations for developing a regulatory definition for "protein," as well as other issues raised by the BPCIA. FDA120-21.

### b. *FDA Issued a Detailed Memorandum Concerning Its Interpretation of "Protein (Except any Chemically Synthesized Polypeptide)."*

In August 2011, FDA issued a detailed internal memorandum ("2011 Protein Memo") "describ[ing] [its] approach, scientific and regulatory deliberations, and conclusions underlying

its interpretation of the category of 'protein (except any chemically synthesized polypeptide)' in the BPCIA's amended definition of 'biological product.'" FDA292. FDA's 2011 Protein Memo represents the culmination of 17 months of research into numerous scientific sources and definitions, and the consideration of public comments and various alternative options. *See, e.g.*, FDA295 n.13-22; FDA296 n.23-31; FDA297 n.32-33; *see also* FDA301-05.

       i.     A Specific, Defined Sequence Is at the Heart of "Protein."

FDA began by "analyz[ing] the current scientific thinking with respect to the meanings of ["protein," "polypeptide," and "peptide"] in order to identify areas where a consensus exists that can inform the agency's interpretation of these terms." FDA294. From this review, FDA determined that "most, if not all, sources" agree that the term "'[p]rotein' refers to chains containing a *specific, defined sequence of amino acids*, generally provided by the DNA sequence of a corresponding gene." FDA297 (citation omitted); *see also* FDA296.

Indeed, the extensive scientific literature considered by FDA shows that a specific, defined sequence is at the crux of what a protein is: "*[e]ach type of protein has a unique sequence of amino acids, exactly the same from one molecule to the next.*" FDA869 (Fed. Reg. Ref.[3] 11); *see also* FDA870, Fig. 3-2 (Fed. Reg. Ref. 11) ("Each type of protein differs in its sequence and number of amino acids; therefore *it is the sequence of the chemically different [amino acids] that makes each protein distinct*."); FDA811 (Fed. Reg. Ref. 1) ("The sequence of amino acids in the chain is of critical importance in the biological functioning of the protein[.]"); FDA839 (Fed. Reg. Ref. 7) ("[t]he striking fact is that each protein has a unique, precisely defined amino acid sequence."); FDA817 (Fed. Reg. Ref. 2) ("Protein molecules consist of one or several long chains (polypeptides) of amino acids linked in a characteristic sequence" which

---

[3] "Fed. Reg. Ref." refers to texts cited by FDA in its proposed rule for the definition of the term "Biological Product" announced via Federal Register on December 12, 2018 ("Proposed Rule").

"is called the primary structure of the protein."); FDA858 (Fed. Reg. Ref. 10) ("The primary structure of a protein is simply the linear arrangement, or sequence, of the amino acid residues that compose it."); FDA846 (Fed. Reg. Ref. 9).

ii.   No Scientific Consensus Exists as to the Definition of "Protein."

In its 2011 Protein Memo, FDA found that there were certain "areas of agreement" with respect to the terms protein, peptide, and polypeptide: (i) all refer to amino acid polymers made up of alpha amino acids linked by peptide bonds; (ii) "protein" refers to chains containing a "specific, defined sequence of amino acids," and (iii) "peptide" generally refers to "smaller, simpler chains of amino acids" (in contrast to "protein," which generally refers to "longer, more complex chains"). FDA297.

At the same time, however, FDA observed that, while the "[s]cientific consensus provides a valid starting point, [it] falls short of supplying a clear protein definition by itself," since "the generally accepted meanings of all three terms overlap in scope to varying degrees," making it impossible to apply the definitions "with sufficient precision such that each refers to a specific, exclusive set of molecules." FDA297-98. FDA further explained that, absent a scientific consensus, it would be "*guided by its scientific expertise, [and] will exercise its discretion to arrive at a definition that makes both scientific and regulatory sense*." FDA294.

After considering various approaches to distinguish "peptides" from "proteins," and three separate size-based options, (FDA302-04), FDA ultimately chose "Option III," which "subject[ed] all amino acid polymers with a specific, defined sequence to a single size cut-off (which would be based on the scientific literature) and categorize them as proteins or peptides without further analysis." FDA304. As such, FDA defined "protein" to mean "[a]ny alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." *Id.*

According to FDA, this definition establishes "a scientifically reasonable, bright-line rule

that provides regulatory clarity and facilitates the implementation of the [BPCIA]." FDA293; *see also* FDA301. FDA ultimately decided against Options I and II because:

> each was likely to invite a case-by-case analysis of every product to determine whether it was a protein in the range where size alone was not a determinant. *Based on FDA's regulatory expertise*, including its experience with antibiotics, where the agency's determination of what constituted an antibiotic was repeatedly challenged, as well as the considerations outlined in Section 2.c ["Agency goals and options"], *any rule that invites a case-by-case analysis in classifying products will result in large transaction costs* both before, during, and after a classification decision has been made, *may lead to inconsistent decision-making* between different Centers, *and will result in uncertainty* for regulated industry which may negatively impact product development. For these reasons, such rules should be avoided if reasonable alternatives exist.

FDA304-05.

### iii.    FDA's Interpretation Took Into Account Chemically Synthesized Proteins.

FDA's 2011 Protein Memo also considered the definition of a "chemically synthesized polypeptide." FDA305-06. FDA determined that any definition of "polypeptide" could not be coextensive with the full scope of "protein" since: (1) "the textual context implies that the exception for chemically synthesized polypeptides applies to a subset of the molecules that would otherwise fall within the 'protein' term"; and (2) "if Congress wished to exclude all chemically synthesized proteins from the definition of biological product, it would have used 'protein' in the parenthetical instead of 'polypeptide.'" FDA306.

FDA concluded that "chemically synthesized" requires the chemical synthesis of a molecule in its entirety, and "polypeptide" includes only amino acid polymers consisting of less than 100 amino acids in size. FDA307-08. In other words, proteins that are chemically synthesized could still qualify as biological products, provided they meet the size threshold. FDA306. FDA contrasted such proteins with chemically synthesized polymers that do not fall within the definition of protein regardless of size, using GA—the very drug at issue in this

case—as an example:

> Given that we are interpreting "protein" to mean amino acid chains of over 40 amino acids with a specific, defined amino acid sequence, *chemically synthesized polymers with random sequences (e.g., glatiramer) fall outside the definition of protein and therefore not subject to the parenthetical exclusion in the first place.*

FDA307.

### c. *FDA Considered Congress's Objectives In Interpreting the BPCIA.*

In considering how to implement the BPCIA, FDA explicitly considered Congressional intent. FDA observed that: (i) given the challenges with demonstrating two protein products have the same active ingredient, "the [BPCIA's] purpose includes establishing a new abbreviated approval pathway with statutory criteria better suited to a determination of interchangeability for such products," (FDA299; *see also* FDA293); (ii) but where the ANDA pathway was available, such as for peptides, Congress did not intend to remove these products from the scope of products effectively regulated under the FDCA. FDA293; *see also* FDA299.

### 3. FDA Subjected Its Interpretation of "Protein" and "Chemically Synthesized Polypeptide" To Notice and Comment Rulemaking.

Following FDA's internal deliberation to define "protein" and the parenthetical exclusion, FDA published a series of industry guidances, and subjected its interpretation to formal notice-and-comment rulemaking, before codifying its interpretation of "protein."

### a. *FDA Published Multiple Industry Guidances.*

On February 15, 2012, FDA published its interpretation of "protein" and the parenthetical exclusion through draft guidance open to public comment. FDA311. Consistent with the 2011 Protein Memo, FDA defined "protein" to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size," based upon, *inter alia*, "scientific literature [which] describes a 'protein' as a defined sequence of alpha amino acid polymers

linked by peptide bonds." FDA328.

On April 30, 2015, FDA finalized this guidance with no substantive change to its interpretation. FDA740; FDA757-59 ("BPCIA Implementation Q&A Guidance"). This final guidance was also open to public comment.

On March 14, 2016, applying its interpretation of "protein" and the parenthetical exclusion, FDA announced a new draft guidance for implementing the Transition Provision and identifying Transition Products, which also was open to public comment. FDA780. FDA interpreted the Transition Provision to mean that "on March 23, 2020, applications for biological products that have been approved under section 505 of the [FDCA] will no longer exist as [NDAs]...and will be replaced by approved [BLAs] under section 351(a) or 351(k) of the [PHSA], as appropriate." FDA790. FDA identified examples of Transition Products, including, *inter alia*, hyaluronidase and pancrelipase products. FDA786; FDA795.

On December 12, 2018, FDA finalized this guidance that, again, was open to public comment. FDA910; FDA916-29 ("Transition Guidance"). That same day, FDA announced it had posted a preliminary list of Transition Products to "enhance transparency and facilitate planning for [March 23, 2020]." FDA883. The preliminary list ("Transition Product List") identified nearly 100 products, including hyaluronidase and pancrelipase products, but not Copaxone. FDA900-09, FDA902, FDA907. FDA also noted that the Transition Product List contains "no currently marketed biological products that were approved through the ANDA pathway." FDA882 n.5.

b.  *FDA Engaged in Notice and Comment Rulemaking To Define "Protein."*

On December 12, 2018, the same day that FDA published its Transition Guidance, and nearly seven years after first announcing its interpretation of "protein" and "chemically synthesized peptide" through industry guidance, FDA issued a Proposed Rule to codify its

interpretation of those terms. FDA801. FDA reiterated that formalizing its interpretation would reduce regulatory uncertainty by adopting a "bright-line" approach that "would allow both FDA and private industry to avoid spending hours and resources on case-by-case determinations" over whether certain products are regulated under the FDCA or the PHSA. *Id.*

Mirroring the analysis set forth in the 2011 Protein Memo, FDA's Proposed Rule detailed the relevant scientific, regulatory, and legal considerations underlying the Agency's interpretation, including public comments submitted in connection with FDA's November 2010 public hearing and BPCIA Implementation Q&A Guidance. FDA802-03. Notably, FDA reiterated that there is scientific consensus that a protein has a "***specific, defined sequence of amino acids***." FDA803.

### 4. Congress Further Amended the PHSA and FDA Finalized Its Rulemaking.

On December 20, 2019, Congress passed the 2020 Act, which amended the PHSA to remove the parenthetical "(except any chemically synthesized polypeptide)" from the statutory category of "protein." Significantly, however, Congress did not remove proteins from the list of qualifying biological products, nor did Congress take this opportunity to define or clarify how "protein" should be defined, instead delegating that function to FDA, just as it did before.

On February 21, 2020, following the 2020 Act and after considering all comments to the Proposed Rule, FDA published its Final Rule codifying its interpretation of "protein," "without change." FDA1024-25. FDA declined to finalize its interpretation of "chemically synthesized polypeptide," determining it was no longer necessary following the deletion of the parenthetical exception. FDA1025. In recognition of the 2020 Act's statutory changes, FDA clarified that, now, all "chemically synthesized *proteins*" would be considered biological products:

> With the FCA Act's removal of the parenthetical exception for "any chemically synthesized polypeptide" from the category of "protein" in the statutory definition of "biological product" in section 351(i) of the

> PHS Act, *all amino acid polymers that meet FDA's interpretation of the term "protein" (including an amino acid polymer that previously would have fallen within the term "chemically synthesized polypeptide" as interpreted by FDA) will be considered to fall within the statutory definition of "biological product.*"

FDA1026.

Moreover, while FDA noted that a regulatory definition for "analogous" protein products was "outside the scope of this rulemaking," the Agency explained that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule." FDA1028.

FDA did not eschew this important interpretive task, however. On March 18, 2020, FDA issued an internal memorandum outlining the factors for determining whether a drug-biologic combination product or a naturally derived mixture that includes a biological product component should be considered an "analogous" product and thus be subject to the Transition Rule. FDA1084-96 ("2020 Analogous Memo"). FDA once again reiterated "it would not be appropriate" to interpret an "analogous" protein product "in a way that would include amino acid polymers that are specifically excluded" from FDA's definition of "protein." FDA1094. As part of its analysis, FDA considered comments submitted to the Transition Product List that set forth an interpretation of "analogous," including comments from Teva related to Copaxone, and "did not find their rationales persuasive." *Id.* at n.35.

## III.   FACTUAL BACKGROUND.

GA—the active ingredient in Copaxone—is a complex mixture of polypeptides made by random polymerization, which Teva has argued—*for 12 years*, via participation in FDA's rulemaking process, eight Citizen Petitions, and multiple lawsuits—should have prevented approval of interchangeable generic versions of Copaxone.

**A.  TEVA FILED EIGHT CITIZEN PETITIONS TO DELAY GENERIC COMPETITION.**

In 2008, Teva petitioned FDA to "neither approve nor accept for filing any ANDA or 505(b)(2) application that cites Copaxone as the reference listed drug." FDA20. Teva also requested that any approved product not be assigned an "A" therapeutic equivalence rating. *Id.* Teva followed up that petition with *seven* other petitions seeking the same ultimate relief: an extension of its exclusivity in the GA market.

In each of its eight petitions, Teva admitted that GA's sequences are not pre-defined, nor specific to any source; rather, GA is made by random polymerization, which means that its sequences depend on reaction chemistry, *e.g.*:

> The above-described *process thus creates* a heterogeneous mixture of potentially millions of distinct, synthetic polypeptides of varying sizes and amino acid sequences.

FDA478; *see also* FDA184 ("As noted above, *the primary structure and identity of the high-molecular weight protected polypeptide mixture* that forms the Copaxone® 'source material'...*are highly dependent upon the starting materials and upon polymerization reaction conditions*."). Teva also acknowledged that "peptide function is determined by primary and higher order structure." FDA485; *see also id.* (referring to "reliance upon the manufacturing process to define the structural profile of glatiramer acetate").

Teva further argued and admitted:

  i.    GA is "a complex mixture of polypeptides," (FDA35), that "appear to range from approximately 20 to 200 amino acids in length, with an average polypeptide length of about 60 amino acids." FDA78.

  ii.    GA consists of four amino acids in a defined molar ratio—not in a defined sequence(s). *See, e.g.*, FDA24; FDA78.

  iii.    GA's sequences and chain lengths are at least somewhat random. FDA78.

iv.    GA contains a "huge, perhaps incalculable number" of sequences. FDA35; *see also*
       FDA173 (the diversity of amino acid sequences is "practically incalculable.").

v.     GA's sequences have not been well-defined. *See, e.g.*, FDA38.

Relying on these arguments, Teva repeatedly proposed stringent approval standards for ANDAs and 505(b)(2) applications for generic GA, including, *inter alia*, clinical studies and switching studies, that went well beyond the traditional approval requirements for generic drugs approved under the FDCA. *See, e.g.*, FDA36-37.

## B.  FDA DENIED ALL EIGHT OF TEVA'S PETITIONS.

With good reason, FDA denied each and every one of Teva's petitions. *See* FDA65-68; FDA107-18; FDA283-91; FDA377-87; FDA486-92; FDA556-63; FDA697-739. As a threshold issue, FDA specifically determined that Teva's manufacturing process for Copaxone results in a product that lacks a specific, defined sequence, and has batch to batch variability. FDA383 n.33 ("As a result of its random polymerization process, Copaxone does not have a specific, defined sequence."); *see also* FDA708-18 (discussing manufacturing process in detail).

Nevertheless, FDA concluded that: (i) a generic GA product could show bioequivalence to Copaxone without the data and studies Teva requested; and thus (ii) ANDAs could be approved and be automatically substituted for Copaxone. FDA699. More specifically, FDA agreed that Copaxone is a complex molecule, but found that the "complexity alone does not preclude a finding of active ingredient sameness between a generic [GA] injection and Copaxone." FDA700. FDA noted the "statutory requirement of sameness 'must be read in the context of the kind of drug at issue,' and 'does not unambiguously require complete chemical identity.'" FDA717 n.68 (citation omitted). FDA explicitly considered the batch-to-batch variation of Copaxone, noting that "active ingredient sameness criteria for a generic [GA] injection should incorporate this batch-to-batch variation." FDA718 n.69. FDA concluded that

"an ANDA applicant...can demonstrate active ingredient sameness by showing equivalence between the ANDA product and the RLD as to the following four criteria: (1) Fundamental reaction scheme; (2) Physicochemical properties including composition; (3) Structural signatures for polymerization and depolymerization; and (4) Results in a biological assay." FDA700.

Further, in its April 16, 2015 denial of Teva's eighth Petition—*i.e.*, almost five years before deciding it would not transition Copaxone to a BLA—FDA determined:

> Although proteins are also composed of amino acids joined by peptide bonds, glatiramer acetate is distinguishable from proteins, because (unlike a protein) it does not, as described above, have a defined and specific amino acid sequence.

FDA708. Teva did not challenge or otherwise seek review of this scientific conclusion.

### C. TEVA FILED MULTIPLE LAWSUITS TO FURTHER DELAY GENERIC MARKET ENTRY.

At the same time Teva was petitioning the Agency to delay, if not outright deny, generic approvals, Teva also asserted a total of 19 patents allegedly covering its Copaxone products against Sandoz, Mylan and others, ultimately losing on the vast majority of claims, and settling others. Significantly, at least four of these patents were "process" patents, which were not listed in the Orange Book. This tactic to extend Teva's exclusivity also failed.

### D. FDA APPROVED SANDOZ'S AND MYLAN'S ANDAS WITH A-RATINGS.

On April 16, 2015, FDA approved Sandoz's 20 mg ANDA—the first ANDA referencing Copaxone to get approval; FDA approved Sandoz's 40 mg ANDA on February 12, 2018. Each of Sandoz's (and Mylan's) 20 mg and 40 mg GA products are A-rated, allowing pharmacists to automatically substitute these more affordable medications for Copaxone. Indeed, Sandoz has been marketing fully substitutable generic versions of Copaxone since ***June 2015***, and Sandoz's and Mylan's products have saved MS patients and their insurers, including Medicare and Medicaid, billions of dollars.

### E.  FDA IMPLEMENTED THE TRANSITION RULE WITHOUT COPAXONE.

As discussed *supra* (Section II(C)(3)), FDA subjected its "protein" and "chemically synthesized polypeptide" definitions to notice and comment rulemaking. Teva, however, never submitted a comment objecting to these definitions. Further (and as noted *supra* Section III(B)), despite the fact that, by at least 2012, FDA had determommined in its citizen petition responses that, "as a result of its random polymerization process, Copaxone does not have a specific, defined sequence," Teva never challenged FDA's early findings that Copaxone was not a protein. *See* FDA383 n.33; FDA708.

On February 19, 2020, however, Teva did an about-face and submitted a comment to FDA's Draft Transition Q&A Guidance requesting that Copaxone be added to the Transition Products List. FDA1008-23. Teva argued that: (i) because GA is a chemically synthesized polypeptide, it must be transitioned because, now that "the exclusion for chemically synthesized polypeptides has been repealed, any such polypeptide is now a 'biological product,'" (FDA1014); (ii) GA satisfies FDA's definition of "protein," (FDA1015); (iii) the sequence and length of each polymer is "defined by the manufacturing process," (FDA1015-16); (iv) inclusion of Vitrase (hyaluronidase) and Creon (pancrelipase) on the Transition Product List means that the amino acid sequence of a protein need not be known and a protein can exhibit variability within or between batches, (FDA1017-18); and (v) GA is at least analogous to a protein, (FDA1019-20).

On March 20, 2020, FDA issued an internal memorandum setting forth its determination that Copaxone is neither a "protein" nor "analogous" to a "protein" and, thus, is not subject to the Transition Provision. FDA1117; FDA1120.

*First,* FDA stated that *all amino acid polymers that meet the definition of "protein," regardless of method of manufacture, will be regulated as biological products*. FDA1120.

*Second,* FDA stated that a "'specific, defined sequence' describes the manner in which specific amino acids are added to a polymer in a defined sequence." *Id.* More specifically:

> [n]aturally occurring and recombinant proteins are made as a result of the synthesis of RNA from a DNA template (transcription) followed by translation into a protein molecule. For such proteins, the existence of a DNA template renders the sequence "specific and defined." Synthetic proteins are generated by the stepwise addition of specific amino acids in a defined sequence.

*Id.* Thus, GA is not a protein because it does not possess a specific, defined sequence since "the sequences are driven by reaction chemistry rather than a pre-defined template." *Id.*; *see also* FDA1121 (noting the short conserved amino acid sequences does not change FDA's view). FDA further justified the inclusion of hyaluronidase and pancrelipase products since "these proteins all have a specific defined sequence because of their inherent DNA/RNA templated source," which is specific and defined for a given species and source. FDA1121.

Lastly, FDA determined that GA is not "analogous" to a protein because this category cannot be used to recapture products that are specifically excluded from the "protein" category. *Id.* Thus, because GA is specifically excluded from the "protein" category (as it lacks a specific, defined sequence), it cannot be "analogous" to a protein. *Id.* FDA cited its 2020 Analogous Memo to show how it applies its expertise to ascertain whether a specific product is "analogous," explaining that certain naturally derived mixtures containing a protein component and other components are "biological products" even though they do not fall within any of the enumerated categories because they are not explicitly excluded from the same. FDA1122 n.16.

## IV.   APPLICABLE LEGAL STANDARDS.

### A.   STANDING.

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498

(1975); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

To establish constitutional standing, Teva must show: (i) an "injury-in-fact," which is defined as an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical, (*Lujan*, 504 U.S. at 560 & n.1); (ii) a "causal connection between the injury and the conduct complained of," (*id*. at 560); and (iii) the injury in question is redressable by the relief sought by the complaint, meaning that it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision,'" (*id*. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976))).

One of the "prudential limitations" on the exercise of jurisdiction is that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *see also Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394-97 (1987). The zone-of-interest inquiry is "one of interpreting congressional intent" (*Clarke*, 479 U.S. at 394), and applies unless expressly negated by Congress (*Bennett*, 520 U.S. at 163). The D.C. Circuit treats prudential standing as "a jurisdictional issue which cannot be waived or conceded." *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994).

## B. Summary Judgment.

"In a case involving review of a final agency action under the APA [], the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012). Rather, "[s]ummary judgment [] serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Hill Dermaceuticals, Inc. v. FDA*, No. 11-cv-01950-RCL, 2012 WL

5914516, at *7 (D.D.C. May 18, 2012) (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). Thus, "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 198 (D.D.C. 2011).

### C. REVIEW OF AGENCY DECISIONS UNDER 5 U.S.C. § 706(2)(A).

Under the APA, FDA's decisions may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard is highly deferential and is even more so where scientific and technical decisions are at issue. *See, e.g.*, *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998). The agency's decision is also entitled to a presumption of validity. *See, e.g.*, *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005) (citation omitted). The reviewing court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Thus, the court must uphold the agency's action if it is "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

When assessing agency action, the Court is governed by the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* I asks whether "Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. *Chevron* II applies when Congress has not directly addressed the issue or has done so ambiguously. In that event, the Court may not "simply impose its own construction on the statute," but rather must determine

whether the agency's construction is based on a permissible interpretation of the statute. *Id.* at 843; *see also id.* at 843 n.11 (in case of ambiguity, the court must uphold the agency's interpretation if it is permissible under the statute; a court need not conclude that agency construction was the only one it permissibly could have adopted or even the reading the court would have reached); *Barnhart v. Walton*, 535 U.S. 212, 218 (2002) (court must decide: (1) whether the statute unambiguously forbids agency interpretation, and (2) whether the agency interpretation exceeds the bounds of the permissible interpretation).

An agency's rule is entitled to *Chevron* deference when Congress has delegated authority to the agency to make rules carrying the force of law and the agency's interpretation was promulgated in the exercise of that authority. *U.S. v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). *Chevron* deference is also warranted where an agency's interpretation emerges from a means less formal than notice and comment rulemaking. *Barnhart*, 535 U.S. at 222 ("[T]he want of notice and comment 'does not decide the case' " against *Chevron* deference") (quoting *Mead*, 533 U.S. at 230-31); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004) (recognizing deference to FDA decision was justified based on, among other things, the complexity of the statutory regime, FDA expertise, and determination on similar issues).

Courts have repeatedly given *Chevron* deference to FDA's interpretation of the statutes it implements, as well as the agency's own implementing regulations. *See, e.g.*, *Actavis Elizabeth LLC v. FDA*, 625 F.3d 760, 764 (D.C. Cir. 2010); *Mylan*, 389 F.3d at 1281; *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono*, 158 F.3d at 1319-20.

## V.    THERE IS NO JURISDICTION BECAUSE TEVA LACKS STANDING.

As the party invoking federal jurisdiction, Teva must establish standing by showing an injury-in-fact that is within the zone of interests protected by the BPCIA. Teva asserts that FDA's failure to transition Copaxone will harm it in three ways: (i) Teva will suffer

informational injury because, if Copaxone is not transitioned, Teva will not be entitled to the information that the BPCIA patent dance provides; (ii) Teva will lose statutory rights because it will not have the ability to receive notice of a potential competitor's application and confidential access to that application prior to the filing of an infringement lawsuit; and (iii) Teva will suffer competitive harm because if Copaxone is not transitioned, generic GA products will continue to be automatically substituted for Copaxone. All of Teva's arguments fail.

### A.   EACH OF TEVA'S PURPORTED HARMS IS WHOLLY SPECULATIVE.

As a threshold issue, each of Teva's purported injuries is wholly unfounded and speculative, which alone precludes a finding of standing. *Lujan*, 504 U.S. at 561. For example, Teva assumes, that at *some point* in the future: (i) there will be additional entities seeking to manufacture a competing version of GA; (ii) those entities will have the technological resources and know-how to file a biosimilar BLA; (iii) those entities would, in fact, file biosimilar BLAs; (iv) after each entity files a biosimilar BLA, it would elect (even though not obligated) to participate in the so-called "patent dance" by notifying Teva of FDA's acceptance of the biosimilar BLA and agree (while not obligated) to disclose its highly proprietary manufacturing information to Teva; and (v) FDA will not change the status of Sandoz's and Mylan's currently-marketed drugs from "A" rated ANDA products to "interchangeable" biosimilar products the same day Copaxone is transitioned. Teva has not, and cannot, show that even one of these presumed events will likely occur, let alone all of them. This proves, without question, that Teva lacks standing.

### B.   THERE IS NO "INFORMATIONAL INJURY."

Teva also argues "had FDA transitioned the COPAXONE NDA to a BLA, Teva would benefit from the BPCIA provision stating that any biosimilar applicant 'shall provide' a copy of its application to the brand-name company." Teva Br. at 17 (citing 42 U.S.C. § 262(*l*)(2)).

This argument fails because "informational standing arises only in very specific statutory contexts where a statutory provision has explicitly created a right to information." *Ctr. for Bio. Diversity v. Bernhardt*, No. 18-cv-02576-RC, 2020 WL 709635, at *7 (D.D.C. Feb. 12, 2020) (citations and quotations omitted); *cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (informational standing properly based on Fair Housing Act which explicitly created an enforceable right to truthful information concerning the availability of housing).

Here, the BPCIA creates no such right. Teva's citation to 42 U.S.C. § 262(*l*)(2) is unavailing, and misleading, because the Supreme Court has specifically held that "Congress did not authorize courts to enforce § 262(*l*)(2)(A) by injunction," which means that reference product sponsors do not have an automatic right to receive notice of a biosimilar BLA or any confidential information contained in the application prior to the filing of an infringement suit. *Sandoz*, 137 S. Ct. at 1675. Thus, standing cannot be based on any alleged "informational injury" here.

### C. TEVA'S "STATUTORY RIGHTS" ARGUMENT FAILS.

Acknowledging the weakness of its informational injury argument, Teva claims a loss of statutory rights to immediately assert a process patent against a biosimilar applicant, whereas Teva would otherwise have "no statutory right to sue for infringement of a process patent upon the filing of an ANDA." Teva Br. at 18 (citing 35 U.S.C. § 271(e)(2)(A)). To be "aggrieved" for purposes of prudential standing, however, Teva "must assert an interest that is arguably within the zone of interests intended to be protected by the statute on which it relies." *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (quoting *Clarke*, 479 U.S. at 399) (zone-of-interests test excludes "those whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit"). Here, Teva's alleged "loss of statutory rights" is expressly outside the zone of

interests of the BPCIA.

In enacting the BPCIA, Congress specifically intended to: (i) create an abbreviated approval pathway for biological products to be deemed "interchangeable" with a reference product, (FDA293); and (ii) create *more* competition, not less. *E.g.*, *Safe and Affordable Biotech Drugs: The Need for a Generic Pathway*, Hrg. before the House Comm. on Oversight and Gov't Reform, 110th Cong. at 2 (H. Hrg. 110-43, Mar. 26, 2007) ("House Oversight Hrg.") (neither the patent system nor science prevents biologic competition—"instead, the monopoly on each of these drugs is perpetuated by the lack of a clear pathway for FDA to approve competing versions. The Hatch-Waxman Act does not reach most of them.").

Just as importantly, creating more barriers to market entry is antithetical to the BPCIA. Thus, Teva's allegations of harm tied to any purported loss of statutory "rights" fails. *See Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 18 (D.D.C. 2008) (no prudential standing where "Congress had a two-fold objective" in enacting the Rx–to–OTC provisions of the FDCA, and "[n]oticeably absent from these objectives is any intent to increase or maintain" physicians' revenue; indeed, protecting said revenue is "antithetical" to the FDCA).[4]

### D.  THERE IS NO COMPETITIVE HARM.

Lastly, Teva argues that it will suffer a competitive injury because Sandoz's and Mylan's GA products are currently automatically substitutable for Copaxone, but if Copaxone is transitioned from an NDA to a BLA, that automatic substitution may cease; in other words, Teva may gain market share if Copaxone is transitioned. This, however, is insufficient to show the required prudential standing. *See Animal Legal Defense Fund*, 29 F.3d at 723 n.2.

*First,* as a threshold issue, mere disadvantage flowing from an agency decision does not

---

[4] Moreover, Teva can always assert its process patents against any future ANDA filer upon, or possibly even prior to, launch. Indeed, it has already done so with respect to both Sandoz and Mylan, and other ANDA applicants.

bestow standing because "a rule that gave any such plaintiff standing merely because it happened to be disadvantaged by a particular agency decision would destroy the requirement of prudential standing; any party with constitutional standing could sue." *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (1988) (oil manufacturers lacked prudential standing under both "protected interests" and "regulated interests" legs of the zone of interests test).

*Second*, standing does not automatically arise from being regulated by the statute-at-issue, nor can it arise from a mere failure to impose stricter regulations on competitors. *See id.*; *see also Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013) (despite being "regulated by the very standards it [was] challenging," lead smelter could not challenge EPA's failure to impose more stringent emission standards on its competitors because it objected "not to any regulatory burden imposed on it but instead to the absence of regulatory burdens imposed on its competitors"); *Calumet Indus., Inc. v. Brock*, 807 F.2d 225, 228 (D.C. Cir. 1986) (oil manufacturers lacked prudential standing to challenge OSHA Notice concerning labeling requirements because "the interest to be protected by the OSH Act is worker safety…not business profits", and because petitioners sought merely "to protect their competitive interests.").

*Third,* while *increasing* competition is within the zone of interests protected by the BPCIA, *suppressing* competition is not. *See ANR Pipeline*, 205 F.3d at 408 (Plaintiff's "only concern is with suppressing competition from Nautilus, and that economic interest is not within the zone of interests protected by NEPA"); *see also Alabama Power Co. v. Ickes*, 302 U.S. 464, 479 (1938) (a redressable injury results only from a violation of a legal right; if there is no right, there is no injury, and there is no right to be immune from lawful competition).

*Fourth,* transitioning Copaxone would give Teva a competitive windfall, which is the opposite of what Congress intended. *See* House Oversight Hrg. at 2 (BPCIA purpose to create

more competition, not less).

*       *       *

For at least the above reasons, Teva lacks standing.

## VI.    ARGUMENT.

### A. FDA'S INTERPRETATION OF "PROTEIN" IS ENTITLED TO DEFERENCE, AND IS PERMISSIBLE UNDER BOTH *CHEVRON* I AND II.

#### 1.    FDA's Interpretation Is Entitled to *Chevron* Deference.

Teva begins its convoluted attack on FDA's statutory interpretation of "protein," claiming that FDA "does not deserve any deference" at all. Teva Br. at 22. The only argument Teva makes in support of this extraordinary claim is that, because FDA interpreted the term "protein" before Congress removed the parenthetical exclusion for "chemically synthesized polypeptides," FDA interpreted "the wrong version of the statute." *Id*. at 21. This is incorrect.

As an initial matter, the term at issue here—"protein"—is part of the PHSA, a statute FDA is expressly charged with implementing. 42 U.S.C. § 262(a)(2)(A) ("The Secretary shall establish, by regulation, requirements for the approval, suspension, and revocation of biologics licenses."). Thus, FDA is entitled to *Chevron* deference here. *Mead*, 533 U.S. at 226-27; *Guedes v. BATFE*, 920 F.3d 1, 20 (D.C. Cir. 2019).

Next, FDA not only had the authority to, but it *did*, interpret the exact term at issue here.

*First*, Congress added proteins to the list of biological products regulated under the PHSA in 2010. And while Congress later removed the parenthetical exclusion for "chemically synthesized polypeptides" in 2019, proteins continue to be governed by the PHSA even after removal of the parenthetical exclusion.

*Second*, FDA interpreted the term "protein" in its 2011 Protein Memo and, as Teva concedes, the Agency subjected such interpretation to notice and comment rulemaking. Teva Br. at 21; *see also* FDA803 (FDA's Proposed Rule); FDA1024 (FDA's Final Rule).

26

*Third*, FDA's interpretation of "protein" has remained unchanged since 2011. Indeed, the definition set forth in FDA's 2011 Protein Memo was later included in numerous industry guidances—all open to comment, (FDA292; FDA327-29; FDA757-59; FDA787 n.3; FDA882-83; FDA947-49), and was included (again, unchanged) in FDA's 2019 final regulations. FDA1024; 21 C.F.R. § 600.3(h)(6).

*Fourth*, FDA has consistently interpreted "chemically synthesized polypeptides" as being a *subset* of "protein" products. FDA306 ("[t]he textual context implies that the exception for chemically synthesized polypeptides applies to a subset of molecules that would otherwise fall within the 'protein' term"); FDA1027 ("we had described the term 'polypeptide' as it appeared in section 351(i) of the [PHSA] prior to enactment of the [2020 Act] as referring to a subset of 'protein'"). As a result, FDA previously applied its interpretation of "protein (except any chemically synthesized polypeptide)" as a two-step inquiry, asking:

(i)      does the molecule meet the definition of "protein"; *and only if so*

(ii)      does the exclusion of chemically synthesized polypeptides apply?

*See* FDA307; FDA796. The practical result of this two-step analysis is that *nothing* about the removal of the exclusion of chemically synthesized polypeptides affected the definition of "protein"—and therefore, there was no reason for FDA to re-visit its well-reasoned interpretation. *See* FDA1026.

Teva's no-deference argument thus fails from the outset.

### 2.   Teva's *Chevron* I Argument is Baseless.

Under *Chevron* I, the burden is on Teva to "do more than offer a reasonable, or even the best, interpretation" of the statute; Teva must show "that the statute *unambiguously* forecloses [FDA's] interpretation." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011). This is something Teva cannot do.

27

As Teva readily admits, neither "protein" nor "chemically synthetized polypeptide" is defined under the PHSA, the BPCIA, or the 2020 Act, and the plain meaning of these terms is not readily apparent. *See, e.g.*, FDA204 ("there is no agreed-upon principle to distinguish between protein polypeptides and non-protein polypeptides"). Given this Congressional silence, this case properly falls under *Chevron* II, as discussed in detail below. S*ee* Section VI(A)(3).

Not to be dissuaded, however, Teva persists with a convoluted *Chevron* I argument, claiming that the 2020 Act "unambiguously forecloses an interpretation of 'protein' that rests on a distinction between natural proteins and synthetic ones." Teva Br. at 22. This is not correct.

*First* and foremost, and as discussed in more detail above, FDA's statutory interpretation does not make this distinction: both naturally derived and synthetic polymers may qualify as proteins, provided they are of sufficient size and have a specific and defined sequence.

*Second*, despite Teva's assertions, there is no indication that Congress removed the parenthetical exclusion because it wanted all chemically synthesized *polypeptides* to automatically qualify as *proteins*—rather, the 2020 Act simply eliminated the distinction between natural and synthetic *proteins* for the subset of amino acid polymers 41 to 99 amino acids in length. FDA previously voiced support for this legislative fix, noting that "[r]emoving this exclusion will help patients because it provides the potential for chemically synthesized follow-on insulins and other protein products to come to market through more efficient abbreviated pathways, regardless of how they are manufactured." FDA975; *see also id.* (the unamended statute "could hurt potential competition because it means if a developer were to chemically synthesize a copy of a protein product (*e.g.*, an insulin copy), the product would not be able to come to market through the abbreviated biosimilar or interchangeable pathway, but instead would have to submit [a stand-alone NDA], which could be much more resource-

intensive"). Thus, both Congress and FDA recognized that, without this fix, neither the 505(b)(2) nor ANDA abbreviated pathways would be available for a chemically-synthesized copy of a naturally-derived protein because the naturally derived reference product would be regulated under the PHSA.

For these reasons, Teva's *Chevron* I argument fails. *See Nat'l Ass'n for Home Care & Hospice v. Burwell*, 142 F. Supp. 3d 119, 124 (D.D.C. 2015) (quoting *Barrington*, 636 F.3d at 660) (if a court determines that "statutory ambiguity has left the agency with a range of possibilities and [that] the agency's interpretation falls *within* that range, [then] the agency [will] have survived *Chevron* [I].").

### 3.   FDA's Interpretation Must Be Upheld under *Chevron* II.

Applying *Chevron* II, FDA's interpretation of "protein," and its application to Copaxone, must be given deference if it is permissible under the statute and FDA offers a reasoned explanation for its decision. *See Barrington*, 636 F.3d at 660 (noting that, at *Chevron* II, courts defer to an agency's permissible interpretation "if [it] has offered a reasoned explanation for why it chose that interpretation"); *AstraZeneca Pharm. LP v. FDA*, 872 F. Supp. 2d 60, 78 (D.D.C. 2012) ("The whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.") (quotation omitted). FDA's decision easily meets these conditions here: (i) FDA's construction is based on a permissible interpretation of the statute; (ii) FDA has offered a reasoned explanation for refusing to transition Copaxone based on this interpretation; and (iii) because this matter falls within the Agency's scientific expertise, FDA is entitled to substantial deference.

Indeed, because the statute does not define "protein," deference to the Agency is at its highest. When "an agency has acted in an area in which it has 'special expertise,' the court must be particularly deferential to [the agency's] determinations." *Sara Lee Corp. v. Am. Bakers Ass'n*

*Ret. Plan*, 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't v.*

*Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988)). As the D.C. Circuit has explained:

> Deferring as appropriate to the agency's expertise and looking only for a rational connection between the facts found and the choice made, we remain ever mindful that in performing a searching and careful inquiry into the facts, we do not look at the agency's decision as would a scientist, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.

*Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 249 (D.C. Cir. 2013)

(quotations and citations omitted).

> a. *The 2011 Protein Memo Sets Forth FDA's Extensive Consideration of, and Ultimate Construction of, "Protein."*

As discussed in more detail above (Section II(C)(2)(b)), the 2011 Protein Memo sets

forth FDA's extensive reasoning and explanation as to why its interpretation of "protein" is

scientifically valid, permissible under the statute, and preferable from a policy perspective.

FDA's rationale is thoughtful, well-reasoned, eminently sound, and easily passes muster under

*Chevron* II. Indeed, the 2011 Protein Memo represents the culmination of 17 months of research

by a multi-disciplinary "protein definition working group," (FDA293; FDA295 n.13-22;

FDA296 n.23-31; FDA297 n.32-33), and the consideration of public comments and various

alternative options. FDA301-05. Further, the 2011 Protein Memo explains that the working

group sought to, *inter alia*, use scientifically sound criteria, provide a bright-line rule, and keep

related molecules under the same regulatory framework. FDA301-02; *see also* FDA293

(definition establishes "a scientifically reasonable, bright-line rule that provides regulatory

clarity and facilitates the implementation of the [BPCIA]"); FDA304-05 (explaining why a

definition of "protein" that invites case-by-case analysis should be avoided).

FDA "analyze[d] the current scientific thinking" regarding proteins, polypeptides, and

peptides in order to "identify areas where a consensus exists that can inform the agency's interpretation of these terms." FDA294. And importantly (and as set forth in more detail *supra* Section II(C)(2)(b)(i)), FDA determined that, as a matter of "scientific consensus," *a specific, defined sequence is at the very heart of what a protein is*. FDA297 ("most, if not all, sources" agree, *inter alia*, a protein has a specific, defined sequence of amino acids); FDA295-96. Indeed, it is the precise order of the amino acids that dictates the structure and function of a protein and that ultimately makes each protein distinct. *See, e.g.*, FDA869 (Fed. Reg. Ref. 11) ("the location of each amino acid in the long string of amino acids that forms a protein determines its three-dimensional shape"); *id.* ("[e]ach type of protein has a unique sequence of amino acids, exactly the same from one molecule to the next"); FDA856-57 (Fed. Reg. Ref. 10) ("[a] key concept in understanding how proteins work is that function is derived from the three-dimensional structure...which is determined primarily by...[the] amino acid sequence."); *see also* FDA870, Fig. 3-2 (Fed. Reg. Ref. 11) ("Each type of protein differs in its sequence and number of amino acids; therefore, it is the sequence of the chemically different [amino acids] that makes each protein distinct"); FDA811 (Fed. Reg. Ref. 1) ("The sequence of amino acids in the chain is of critical importance in the biological functioning of the protein[.]).

FDA also found, however, that while the "scientific consensus provides a valid starting point, [it] falls short of supplying a clear protein definition by itself," given that there was no clear agreement as to certain other characteristics of a protein, such as size, function, and structure, to differentiate a "protein" from other amino acid polymers. FDA297-98. FDA thus explained that, absent scientific consensus, it is "guided by its scientific expertise," and it was exercising its "discretion to arrive at a definition that makes both scientific and regulatory sense." FDA294.

Given the extensive nature of FDA's examination of this issue, it cannot reasonably be disputed that FDA offered "a reasoned explanation for its interpretation" of "protein."

   b.  *FDA's "Protein" Definition Was Subject to Notice and Comment Rulemaking.*

Significantly, not only did FDA thoroughly subject its statutory interpretation of "protein" to internal scientific vetting at the Agency, FDA subjected that very same interpretation of "protein" to public scrutiny and comment through a series of industry guidances and formal notice and comment rulemaking:

> FDA seeks comments on the following issues: 1. What scientific and technical factors should FDA consider if it develops a regulatory definition for the category of "protein" (as distinguished from peptide or polypeptide)? 2. What scientific and technical factors should FDA consider if it develops a regulatory definition for the category of "any chemically synthesized polypeptide"?

FDA121 (10/5/2010 Fed. Reg., Req. for Comments); *see also* FDA311, FDA328 (2/15/12 Fed. Reg., Draft Guide. for Indus. (Q&A re: Implementation of the BPCIA)); FDA740, FDA757-59 (4/30/15 Fed. Reg., Guide. for Indus. (same)); FDA780, FDA790 (3/14/2016 Fed. Reg., Draft Guide. for Indus. (Implementation of "Deemed to be a License" Provision)); FDA801 (12/12/18 Fed. Reg., Def. of Term "Biological Product"); FDA873, FDA876 (12/12/18 Fed. Reg., Draft Guide. for Indus. (Q&A re: "Deemed to be a License Provision")); FDA900 (12/12/18 Preliminary List of Transition Products); FDA910, FDA913 (12/12/18 Fed. Reg., Guide. for Indus. (Interpretation of "Deemed to be a License" Provision)).

As such, FDA's definition of "protein" has the force and effect of law and is entitled to deference. *Ranbaxy Labs. Ltd. v. Burwell*, 82 F. Supp. 3d 159, 181 (D.D.C. 2015) ("When Congress has delegated to the agency authority to make rules carrying the force of law, and the challenged agency interpretation was promulgated in the exercise of that authority, then the agency's rule is entitled to deference.").

> *c.* *FDA's Refusal to Transfer Copaxone Is Proper Because GA Is Not a Protein.*

FDA's refusal to transfer Copaxone under the PHSA is wholly proper because, as Teva admits, GA does not have a specific, defined sequence.

Indeed, during the entire seven-year period Teva was petitioning the Agency to prevent generic competition for Copaxone, Teva argued that GA is a heterogeneous mixture, and that its sequences are not pre-defined, because it is made by random polymerization, *e.g.*:

> The above-described process *thus creates* a heterogeneous mixture of potentially millions of distinct, synthetic polypeptides of varying sizes and amino acid sequences.

FDA478; *see also* FDA35; FDA38; FDA173; FDA184; FDA485.

FDA agreed, and linked the fact that GA does not have a specific defined sequence to Teva's manufacturing process, stating: "[a]s a result of its random polymerization process, Copaxone does not have a specific, defined sequence." FDA383 n.33; *see also* FDA708-18 (discussing manufacturing process in detail), FDA707 ("The nature of Copaxone's synthesis process [] results in a product with inherent variability."). Thus, despite its disingenuous assertions to the contrary (*see, e.g.*, Teva Br. at 15), Teva is acutely aware that the manner in which a polymer is made is tied directly to whether that polymer will have a specific, defined sequence.

As discussed above, and as FDA has explained, the amino acid sequences within GA are "driven by reaction chemistry rather than a pre-defined template." FDA1120. This means that the precise amino acid sequence of each polymer chain is not determined prior to synthesis, but rather directly results from the specific controls applied during the manufacturing process, which dictate how the amino acids self-assemble. *Id.* And as FDA explained in denying Teva's eighth Citizen Petition, a specific, defined sequence requires that the entire sequence is replicated batch-to-batch. *See, e.g.*, FDA707 ("there is a negligible likelihood that the specific amino acid

33

sequences along the entire copolymer chain will be conserved from batch to batch. Rather, Copaxone exhibits batch-to-batch amino acid sequence variations across the copolymer, coupled with conservation of shorter 'local' sequences within the copolymer.").

For well over a decade, Teva and FDA have agreed on one thing: Copaxone does not have a specific defined sequence. FDA has thus provided: (i) a reasoned explanation for not considering GA a protein; and (ii) support for its decision not to transition Copaxone. *See generally* 2011 Protein Memo (FDA292-310); 8th CP Denial (FDA697-739); 2020 Decision Memo (FDA1117-23).

> ### d. *Teva's Arguments All Fail.*

Ignoring well-settled science, Teva makes a variety of attacks on FDA's well-reasoned "protein" definition. None of Teva's arguments have merit.

> #### i. FDA's Statutory Interpretation Recognizes, and Expressly Incorporates, Chemically Synthesized Proteins.

Teva insists that Copaxone would be classified as a protein if it were a natural product. Indeed, at the heart of Teva's entire argument is the baseless assertion that FDA excludes chemically synthesized proteins from its definition of "protein." *See, e.g.*, Teva Br. at 1 ("FDA would reach the opposite conclusion if COPAXONE were not chemically synthesized"); *id.* at 25 ("[t]here is no longer any basis for defining 'protein' in a way that leaves chemically synthesized proteins regulated by the FDCA but transitions materially indistinguishable proteins to be regulated under the PHSA"); *id.* ("The statute now makes clear that 'proteins' include some chemically synthesized proteins."). Teva is thoroughly incorrect.

As an initial matter, the fact that FDA's "protein" definition previously excluded chemically synthesized polypeptides between 41 and 99 amino acids long (consistent with the parenthetical exclusion) does not mean that chemically synthesized molecules could not be

"proteins" under FDA's interpretation. Far from it—FDA's definition of "protein" has *always* included chemically synthesized molecules that are more than 100 amino acids long that also met the "specific, defined sequence" requirement. FDA307 ("Molecules of 100 amino acids or larger are proteins that are not polypeptides and will be regulated as biological products regardless of their mode of synthesis.").

Further, following the 2020 Act and the deletion of the parenthetical exclusion, FDA made crystal clear that chemically synthesized *proteins* would qualify as biological products:

> [A]ll amino acid polymers that meet FDA's interpretation of the term "protein" (including an amino acid polymer that previously would have fallen within the term "chemically synthesized polypeptide" as interpreted by FDA) will be considered to fall within the statutory definition of "biological product."

FDA1026. As such, one of the main pillars of Teva's brief simply collapses.

### ii. A Chemically-Synthesized Protein Must Necessarily Have a Specific, Defined Sequence.

Relatedly, Teva argues that FDA's statutory interpretation "uniquely burdens chemically synthesized proteins" based on the scientifically unsound premise that a specific, defined sequence is "something that all natural proteins may have, but that chemically synthesized proteins may not." Teva Br. at 1, 25; *see also id.* at 8 (no source "suggested that a chemically synthesized protein must likewise have a specific, defined sequence of amino acid"). This is, simply put, wrong—and certainly no basis to question FDA's scientific expertise and judgement under *Chevron* II.

As discussed above: (i) a specific, defined sequence is at the heart of what a protein is because each protein's unique sequence determines its structure and function, (FDA297; FDA296; FDA811; FDA869; FDA857; FDA870; FDA872); and (ii) both naturally-derived and chemically synthesized proteins have a specific, defined sequence. FDA1120; *see also* FDA306

("Even though chemical synthesis of amino acid polymers with a defined sequence has been historically restricted to shorter peptide chains, modern chemical ligation methods are rapidly pushing these limits upwards.").

*      *      *

For at least the above reasons, FDA's interpretation of "protein," and its resulting refusal to transition Copaxone, should be upheld under *Chevron* II.

## B. FDA's Application of Its Protein Definition Has Not Been Arbitrary Or Capricious.

Teva next argues that FDA's refusal to transition Copaxone on grounds that it lacks a "specific, defined sequence" is arbitrary and capricious because FDA has not consistently required the same of other products. Teva Br. at 27. Teva's arguments wholly ignore the relevant science, and are without merit.

### 1. FDA Does Not Distinguish Between Natural and Synthetic Proteins: Each Is Held To the Requirement for a Specific, Defined Sequence.

Teva first argues that "FDA has subjected like cases to dramatically different treatment" because "amino acid polymers derived from natural sources, such as hyaluronidase and pancrelipase, can ignore th[e] requirement [for a specific, defined sequence] entirely." Teva Br. at 28. Not so. For one, both naturally derived and chemically synthesized proteins require a specific and defined sequence. Naturally derived proteins are produced through a two-part process known as "transcription" and "translation," where RNA is used to produce proteins that correspond to a prescribed amino acid sequence that is coded from DNA. *See e.g.,* FDA839. For chemically synthesized proteins, amino acids are added in an orderly stepwise manner based on a predetermined sequence through a process known as chemical ligation. *See e.g.*, FDA0306. Second, even if characterizing certain naturally derived proteins like hyaluronidase and pancrelipase may be challenging, they "have a specific defined sequence because of their

36

inherent DNA/RNA templated source." FDA1121; *see also* FDA1120 (the precise order of the amino acid sequence is pre-determined from a DNA template).

In sum, FDA *never* ignores the critical requirement of a specific, defined sequence; rather, the simple fact is that *every* naturally derived protein will inherently meet it, which is one of the reasons FDA selected this characteristic as a key defining criteria for proteins to begin with. *See supra* Section II(C)(2)(b)(i).

### 2.  FDA's Treatment of Vitrase, Creon, and Copaxone Is Not Inconsistent.

Continuing with the same disparate treatment argument, Teva asserts, *inter alia*, that: (i) FDA cannot identify the active ingredients in Vitrase (hyaluronidase) and Creon (pancrelipase) with chemical certainty; and (ii) "Vitrase [and] Creon have active ingredients whose sequences vary from molecule to molecule." Teva Br. at 29. The critical flaw in this argument is that both assertions are irrelevant to whether Vitrase and Creon have specific and defined sequences.

As a threshold issue, Teva obscures the relevant inquiry, which is whether a particular molecule always has the same specific, defined amino acid sequence every time it is produced. *See, e.g.*, FDA839 (Fed. Reg. Ref. 7) ("The striking fact is that each protein has a unique, precisely defined amino acid sequence."); FDA869 (Fed. Reg. Ref. 11) ("Each type of protein has a unique sequence of amino acids, exactly the same from one molecule to the next."); *see also supra* Section II(C)(2)(b)(i).

Teva also elides the following key fact: some naturally derived biological products, such as hyaluronidase and pancrelipase, are comprised of a mixture of proteins, and may have other components. *See, e.g.*, FDA1089 ("naturally derived mixtures composed primarily of protein components as their active ingredient (e.g., hyaluronidase, pancrelipase, sacrosidase) fall within the Agency's interpretation of the statutory term 'protein' and thus are 'biological products.'"). And since these mixtures are derived from animal sources, there may be some variability as to

which particular proteins are present, based on the species and tissue the mixture is extracted from.

Indeed, FDA has specifically explained that hyaluronidase products may contain "a single type of hyaluronidase molecule [*e.g.*, "HYAL1"] or multiple types of hyaluronidase molecules [*e.g.*, "HYAL1," "HYAL2," "HYAL3," etc.] extracted from the same type of tissue from the same species." FDA10. And although "the types of hyaluronidase molecules present may [also] vary from batch to batch for a given drug product," (*id.*), this simply means that, for example, one batch may contain a mixture of "HYAL1" and "HYAL2," while another batch may contain a mixture of "HYAL1," HYAL2" and "HYAL3." But, key to the analysis, here: the sequence of "HYAL1" is always the same, and the sequence of "HYAL2" is always the same, even though "HYAL1" and "HYAL2" have different sequences because they are different proteins.

This is in stark contrast to GA, where—as Teva has repeatedly admitted, and FDA has repeatedly explained—the amino acids are "mixed together," (FDA168), and undergo "random polymerization," thus preventing Copaxone from "hav[ing] a specific, defined sequence." FDA383 n.33; *see also* FDA478 ("The above-described process thus creates a heterogeneous mixture of potentially millions of distinct, synthetic polypeptides of varying sizes and amino acid sequences."); FDA707 ("The nature of Copaxone's synthesis process [] results in a product with inherent variability."). Indeed, as FDA has explained, because GA's "sequences are driven by reaction chemistry rather than a pre-defined template," there is "a negligible likelihood of having identical amino acids sequences along entire copolymer chains from batch to batch." FDA1120-21.

In sum, FDA has not held Vitrase or Creon to a different standard than Copaxone. FDA's

decision not to transition Copaxone is based on "reasoned decision making," and there is nothing arbitrary or capricious about it.

### 3.   FDA's Approval of GA ANDA Products Is Not Inconsistent.

Teva also argues that FDA's approval of GA ANDA products shows that the Agency's application of its protein definition is arbitrary and capricious. Like Teva's other arguments, this argument is wrong on both the science and regulatory requirements.

> #### a.   _A Specific, Defined Sequence Requires that the Entire Sequence Be Replicated for Each Protein Molecule._

Teva first argues that FDA subjected Copaxone to arbitrary and capricious "differential treatment" because it "acknowledged that there are '[c]onserved [i.e., replicated] sequences in [GA].'" Teva Br. at 32. This assertion is fatally flawed, however, because "a specific, defined sequence" means that the entire amino acid sequence is precisely conserved every time the protein is produced. The small portions of local sequences that are conserved between GA batches are simply not the same thing. _See_ FDA707 ("[T]here is a negligible likelihood that the specific amino acid sequences along the entire copolymer chain will be conserved from batch to batch. Rather, Copaxone exhibits batch-to-batch amino acid sequence variations across the copolymer, coupled with conservation of shorter 'local' sequences within the copolymer").

> #### b.   _FDA's Approval of GA ANDA Products Does Not Mean GA's Sequences Are Specific and Defined._

Teva next tries to meet the "specific, defined sequence" requirement by arguing that GA's sequences are "sufficiently well defined, such that the ANDA applicant can demonstrate 'that the molecular identity and diversity of [generic GA] is equivalent to that of the active ingredient in Copaxone,'" and that this, alone, should satisfy the "specific, defined sequence" protein criterion. Teva Br. at 32-33. This still misses the mark.

_First_, the analysis FDA undertakes in determining whether a generic product has the

"same" active ingredient as its RLD is entirely unrelated to the analysis the Agency undertakes in determining whether a product has a "specific, defined sequence" for purposes of meeting the definition of "protein." Indeed, in finding that "GA has been adequately characterized for purposes of approving a generic product," (FDA700), FDA explicitly recognized that the "nature of Copaxone's synthesis process [] results in a product with inherent variability, even when it is tightly controlled." FDA707 ("negligible likelihood" of conservation along entire chain). Indeed, at the time FDA made its ANDA sameness criteria public in 2015, it went on record expressly stating that "[GA] is distinguishable from proteins because (unlike a protein) it does not...have a defined and specific amino acid sequence" due to "broader sequence variability inherent to Copaxone." FDA708; *see also* FDA1121; FDA383 n.33.[5]

*Second*, FDA did *not* base its sameness standard on the "conservation of shorter 'local' sequences within" Copaxone. FDA707. Rather, as Teva well knows, the Agency considered both the so-called "conserved" aspects of Copaxone along with variations in other characteristics (including the "broader sequence variability") in "establishing active ingredient sameness criteria" for generic GA products. FDA707. And even with the so-called conserved characteristics, FDA still "observed some degree of batch-to-batch variability in Copaxone." FDA707 n.38.

*Third*, FDA considers more than just these small conserved amino acid sequences when evaluating active ingredient sameness for generic GA products. FDA716. As meticulously detailed in FDA's 40-plus page response to Teva's eighth citizen's petition, in order to take GA's complexity into account, FDA performed an in-depth analysis of Copaxone's manufacturing process, (FDA708-16) and concluded:

---

[5] Notably, FDA explained the differences between proteins and GA *years* before FDA considered and rejected Teva's comment to the Transition Docket.

> Although currently there is no single physicochemical or biological characterization that can demonstrate active ingredient sameness between a generic [GA] injection and Copaxone, there is a battery of characterizations that, when combined, can be applied to comparatively characterize [GA] and provide a collection of scientific evidence sufficient to establish active ingredient sameness.

FDA716-17. FDA then further explained that an ANDA applicant must show active ingredient sameness as to the following four criteria: (i) fundamental reaction scheme; (ii) physiochemical properties (including composition); (iii) structural signatures for polymerization and depolymerization chemistry; and (iv) "equivalence in a biological assay." FDA726; *see also* FDA717. According to FDA, "[t]hese four criteria take into account the inherent molecular diversity associated with [GA] and, taken together, are designed to provide overlapping and confirmatory evidence of active ingredient sameness through which FDA can conclude that generic [GA] has the same active ingredient as Copaxone." FDA717.

*Fourth*, FDA's sameness standard considers the inherent batch-to-batch variability of GA and does not depend on whether GA has a specific and defined sequence. The "statutory requirement of sameness 'must be read in the context of the kind of drug at issue,' and 'does not unambiguously require complete chemical identity.'" (FDA717 n.68 (citation omitted)). As such, consistent with the non-specific and non-defined nature of GA, FDA "evaluate[s] active ingredient sameness by considering the level of variability in [Copaxone] compare[d] to that of the proposed generic product" and does not require any given batch of a generic GA product to be identical to any single batch of Copaxone. FDA717-18.

In sum, there is more than sufficient evidence in the record to show that FDA did not act arbitrarily or capriciously in approving generic versions of Copaxone, while simultaneously concluding that Copaxone itself does not have a specific, defined sequence.

### C. COPAXONE IS NOT ANALOGOUS TO A PROTEIN BECAUSE IT LACKS A PROTEIN'S UNIQUE FEATURE.

#### 1. FDA's Interpretation of "Analogous" Is Not Foreclosed Under *Chevron* I.

It is undisputed that neither the PHSA nor BPCIA defines "analogous." However, Teva argues that the presence of the "analogous" product category in the definition of biological product is an express "catchall" that captures GA. This argument fails, and FDA's interpretation and application of the term "analogous" survives *Chevron* I.

##### a. *FDA Already Determined that GA Lacks the "Critical Features" of a Protein.*

Teva first argues that a product is "analogous" to a protein if it shares the "critical features" of a protein. Teva Br. At 37. This argument has no merit here because FDA has already performed a "critical features" analysis. Indeed, as discussed herein, the critical features of a protein are: (i) a specific, defined sequence; and (ii) a chain length of at least 40 amino acids. 21 C.F.R. § 600.3(h)(6). FDA compared those critical features to GA, determined that GA lacks said critical features, and determined that GA is not "analogous" to a protein. Thus, Teva's "critical features" argument fails.

##### b. *FDA Already Rejected Criteria Based on Function and Structure.*

Teva next argues that GA is functionally and structurally similar to the biological products listed in Section 262(i) because it purportedly also "modulates an immune response." Teva Br. at 39. Teva further argues that FDA's regulations finding other products "analogous" to specific biological products "all focus on whether a product shares the same immunological function and basic building blocks as the enumerated biologic." *Id*. at 38. This is false. FDA's "regulatory description of products that are analogous to a virus, therapeutic serum, or a toxin or antitoxin reflects *a range of interpretive approaches* (e.g., based on source material, structure, function or mode of action) to the scope of the statutory phrase." FDA1094-95. FDA thus does

not take a one-size-fits-all approach to regulating analogous products; it sets specific criteria for each enumerated category based on what is scientifically appropriate for that category.

Significantly, FDA previously considered—and rejected—the exclusive use of functional or structural criteria as defining characteristics for proteins, because doing so would introduce ambiguity and facilitate inconsistent implementation of the statute. FDA300. Thus, determining whether a product is "analogous" to a biological product based solely on functional or structural criteria is not appropriate.

Indeed, if all structurally- or functionally-similar products fell into the "analogous product" category, *many* amino acid polymers would be considered biological products, including peptides with fewer than 40 amino acids. *See* FDA300 (some "proteins carry out functions that are identical to those carried out by peptides (*e.g.*, reversible binding and signaling)" and "the presence of higher order three-dimensional structure is not a reliable criterion to clearly distinguish peptides" from proteins). This cannot be what Congress intended, given that an abbreviated approval pathway already exists for peptides under Hatch Waxman. *See, e.g.*, FDA293; FDA299. In fact, far from being foreclosed by the statute, FDA's decision to hold products that are "analogous" to proteins to the same sequence and size criteria best achieves Congress' objective of creating a new abbreviated approval pathway for products for which the ANDA pathway was not available.

## 2. FDA's Interpretation of "Analogous" Is Reasonable under *Chevron* II.

FDA's determination that GA is not an "analogous" product also survives *Chevron* II because it is a reasonable construction of an ambiguous statutory term, and should be accorded deference. *Ranbaxy*, 82 F. Supp. 3d at 182; *Sara Lee*, 512 F. Supp. 2d at 37.

### a. *Teva's Argument Strips "Analogous" of any Meaning or Boundaries.*

*First,* as noted above, because a specific, defined amino acid sequence is one of the key

features of a protein, it is reasonable for FDA to require any "analogous product" to exhibit the same feature. Teva claims that "the entire point of the 'analogous product' category" is to capture products that "do not fall squarely within" the "enumerated categories." Teva Br. at 41. But if that were true, then *all* products falling outside the enumerated categories could be deemed "analogous" to those that are enumerated—and the term "analogous" would have no meaning, nor any boundary. Relatedly, just because chemically synthesized polypeptides are no longer *excluded* from the statute, that does not mean that all such products are automatically deemed *included*. Indeed, it is eminently reasonable for FDA to conclude that any product that is *expressly* excluded from the protein category cannot be deemed "analogous" to a protein. FDA thus acted reasonably in excluding GA from the list of Transition Products.

> b. *FDA Has Applied Its Interpretation of "Analogous" Consistently.*

*Second,* FDA has applied its interpretation of "analogous" product consistently, and, in relation to proteins, has transitioned only those products that share the same key features of a protein. *See, e.g.*, FDA1084 (including several drug-biologic combination products and naturally derived mixtures). For example, FDA has determined that certain naturally derived mixtures may be transitioned as "analogous" products only if they are comprised, at least in part, of a biological product (*e.g.*, protein). FDA1090, FDA1095. Also, FDA will consider such products "analogous" only if the protein component is necessary for the product's activity and contributes to the intended therapeutic effect. *Id.* Thus, while these naturally derived mixtures do not clearly fall within the "protein" category due to the presence of other non-biological products, unlike GA, they are not expressly excluded from the category of "analogous" products because the protein component still has a specific and defined amino acid sequence.

**VII.     CONCLUSION.**

Teva's Motion for Summary Judgment should be denied. As a threshold issue, Teva has no standing. Indeed, all of Teva's complained-of harms are speculative. Further, each of Teva's alleged harms (informational injury, loss of statutory rights, and competitive harm) is fundamentally legally and factually flawed.

However, if the Court does reach the merits, Teva's Motion should still be denied because FDA applied its highly-scientific, well-reasoned, long-standing, publicly-vetted interpretation of "protein" to reasonably conclude that Copaxone is not a biologic product that should be transitioned to a licensed BLA. As such, FDA's decision is entitled to a high level of deference. FDA also properly concluded that Copaxone is not "analogous" to a protein because Copaxone lacks the feature at the very heart of what a protein is: a specific, defined sequence. Furthermore, FDA has applied its "protein" definition consistently and in a well-reasoned manner.

Thus, for at least the reasons enumerated herein, Sandoz respectfully requests that Teva's Motion for Summary Judgment be denied, and that Sandoz's Inc.'s Cross-Motion for Summary Judgment be granted.

Dated: July 2, 2020                    Respectfully submitted,


By: _/s/ William A. Rakoczy_____
    William A. Rakoczy
     D.C. Bar No. 489082
    Lara E. FitzSimmons
    Rachel P. Waldron
    Trang H. Lin
    Chris P. Galligan
    RAKOCZY MOLINO MAZZOCHI SIWIK LLP
    6 West Hubbard Street, Suite 500
    Chicago, IL 60654
    (312) 222-6301
    (312) 222-6321 (facsimile)
    wrakoczy@rmmslegal.com
    lfitzsimmons@rmmslegal.com
    rwaldron@rmmslegal.com
    tlin@rmmslegal.com
    cgalligan@rmmslegal.com

    *Counsel for Sandoz Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2020, I electronically filed Sandoz Inc.'s Consolidated Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Sandoz Inc.'s Cross-Motion for Summary Judgment with the Clerk of Court using the CM/ECF System, which will automatically send copies to all attorneys of record.

By: */s/ William A. Rakoczy*